WARD, Judge.
The City of New Orleans appeals a decision of the City Civil Service Commission reinstating Daniel McMullen to the position of captain in the New Orleans Police Department. We find no manifest error in the Commission's findings of fact and conclude that based upon those facts, the Commission correctly determined no cause for McMullen’s dismissal. We therefore affirm.
McMullen, a twenty-year veteran of the police force and former commander of the Department’s First District, held the position of Deputy Superintendent when he was suspended on December 9, 1985 and dismissed 119 days later following a departmental administrative hearing. This disciplinary action was based upon alleged violations of police department rules and procedures which occurred while McMullen was commander of the First District.
All of the alleged violations stem from incidents involving Charles Buie, a young man who had been a civilian volunteer at the First District police station for several years before McMullen took over the command of the District. Buie, described by McMullen as a “police buff,” spent many hours each week at the district station where his assigned duties included supervising janitorial work, running errands, washing police vehicles and serving as receptionist. Through the years, however, because Buie was eager and aggressive he gradually had assumed other duties and responsibilities, including work usually done by police officers or by the Department’s administrative staff.
The first two incidents for which McMul-len was disciplined were very similar. Each involved a request by a French Quarter art gallery for security services during functions at the gallery. Off-duty police officers were to provide the services and be paid by the gallery. Such an arrangement, called a “paid detail” by the police, is common practice and entirely proper. However, in the two incidents at issue in this case, the “paid details” were highly irregular because, although the gallery owner thought she was paying for the officers’ time, the officers who provided the services were on-duty and paid by the City of New Orleans. The City’s allegations of what occurred are described by Police Superintendent Warren Woodfork in the letter notifying McMullen of his dismissal.
Sometime during September, 1984, Ms. Connie Heaphy of the Dyansen Gallery, located at 433 Royal Street, made arrangements with Mr. Charles Buie for a paid detail to be worked by four police officers on September 19, 1984, around the Gallery. A check for two hundred and eighty-eight dollars ($288.00) was issued by the Gallery payable to Dan McMullen and Associates on September 18, 1984. Ms. Heaphy personally deliv *1229 ered this check and invitations for the Gallery event to you, Captain McMullen, on September 18, 1984, at the First District Station. At this time she also informed you of the locations around the Gallery where she desired the police officers, who would be working the detail, to be stationed.
On September 19, 1984, you instructed Sgt. Raymond Fournet to have on-duty police officers handle this paid detail assignment around the Gallery and Sgt. Fournet complied with your instructions. The check for two hundred and eighty-eight dollars ($288.00) was endorsed by you for deposit.
Ms. Heaphy made arrangements with Charles Buie to have a second paid detail for seven officers at the Gallery on November 20, 1984. A check for five hundred and seventy-six dollars ($576.00) was issued by the Dyansen Gallery, payable to Dan McMullen and Associates. This check was picked up by Charles Buie at the Gallery. Approximately one week prior to the event at the Gallery, Ms. Heaphy delivered four invitations for the event to you, personally, at the First District Station. As you were scheduled to be out of town during this second event, sometime after meeting with Ms. Heaphy, you met with Sgt. Fournet and instructed him to handle this detail with on-duty officers just as he had handled the previous detail at the Gallery. Sgt. Fournet complied with those instructions and assigned on-duty officers to handle that assignment. Ms. Heaphy saw you approximately one week after the event and thanked you for arranging the detail. The check for five hundred and seventy-six dollars ($576.00) was endorsed with the name Dan McMullen, with the initials “CB”, and cashed by Mrs. Mildred F. Gilbert for Charles Buie.
McMullen’s description of these incidents differs from the City’s version only on a few significant points. McMullen claims that when he received the request for the September detail from Buie, who had taken the necessary information from Heaphy over the telephone, he denied the request because he felt the area was sufficiently covered by foot patrols of NOPD officers and state troopers, who had been assigned to New Orleans for the 1984 World Exposition. McMullen placed in evidence a memorandum from Buie to. McMullen which requests a total of eight officers and state troopers to be detailed to the 400 block of Royal Street for “Mayor’s Function ... Grand Opening Mindi Gutman Art Gallery.” Written on the memo and initialed by McMullen is the notation, “Disapproved. 2nd platoon to handle as workload permits.” McMullen admits cashing the $288.00 check for Buie who told him that it had inadvertently been made payable to the account McMullen used to disburse payments to officers for paid details McMullen arranged. He explains that he did not connect the check to Buie’s memorandum requesting a paid detail for two reasons. First, the check was from the Dyansen Gallery and Buie’s request was for the Mindi Gutman Gallery. And second, because the usual practice was for details to be paid for after the services were rendered and the client had been sent an invoice, Buie told McMullen and McMullen believed the Dyansen check was for a previous paid detail, when in fact, Buie had told Heaphy that payment in advance was required.
McMullen explains the second “paid detail” in much the same way as the first. He denies all knowledge that money was received for placing police officers in front of the gallery. He says that his signature was forged on the second check endorsement.
The only significant irreconcilable discrepancy in McMullen’s version of the incidents is his insistence that he got the check for the first detail from Buie, while Heaphy is certain that she gave it directly to McMullen. Despite McMullen’s obvious interest in the outcome of the hearing and Heaphy’s disinterest, the Commission chose to believe McMullen. The Commission’s conclusion regarding the incidents was that Charles Buie alone planned and carried out both. After a thorough review of the testimony and documentary evidence presented at the hearing, we find no manifest error in the Commission’s determination that *1230 McMullen was not directly involved in the scheme. We therefore cannot say the Commission abused its discretion in concluding that the City failed to prove that the “paid detail” incidents were cause for disciplinary action.
Based upon the paid detail incidents, McMullen was arrested for malfeasance in office and public payroll fraud. He was ultimately tried and acquitted. The arrests, however, caused McMullen’s suspension for violating the departmental regulation requiring adherence to law. By the time he was dismissed, the police department had charged McMullen with two other violations of regulations relating to “Neglect of Duty” and “Instructions from Authoritative Source.” Although Superintendent Woodfork stated that these alleged violations would not warrant McMullen’s dismissal, they were also described in the superintendent’s letter dismissing McMul-len.
During the latter part of 1984, allegations were brought to your attention, indicating that Charles Buie had possession of a firearm that was loaned to him by First District Police Officer Grafton Salvant, which he, Buie, had refused to return to the officer. Officer Salvant made repeated demands of Charles Buie during the years 1983 and 1984 to return his weapon, but to no avail. After receiving no satisfaction, Salvant initiated a criminal complaint under item number L-17422-85. You assigned Police Officer John Auster to look into this matter. It was determined that the weapon belonging to Officer Salvant had been pawned by Buie. Additionally, it was also discovered that a weapon belonging to you had also been pawned by Buie. Despite having this information concerning Mr. Buie’s behavior, you continued to allow him to work and associate himself in and around the First District Station.
McMullen testified that both guns which Buie had borrowed and pawned, Officer Salvant’s gun and his own target pistol, were returned by Buie within days of the investigation. He further stated that when he spoke with Buie about the incident, Buie “put on a crying act for me and told me he needed the money. He had lost his job. He had intended to redeem the guns before anybody found out about it....” McMul-len testified that he ordered Buie away from the station, but several weeks later, some of the officers interceded for Buie and persuaded McMullen to let him come back. After a stern lecture, McMullen allowed Buie to resume his duties.
The Police Department’s factual account of the gun incident does not differ in any significant way from McMullen’s testimony. There being no issue of fact, our review is limited to a determination of whether the Commission’s finding, that the alleged neglect of duty was not a cause for disciplinary action, is arbitrary, capricious or an abuse of discretion. Under this standard, we must affirm the Commission’s ruling.
The final incident for which McMullen was disciplined was his alleged disobedience of Superintendent Woodfork's order that Charles Buie be kept away from all police facilities and vehicles and away from all on-duty police officers, 24 hours a day. There is a significant factual dispute with regard to this alleged violation. The Superintendent stated in his letter to McMul-len and testified that he gave the verbal order in August, 1985. McMullen testified that he received the order on September 18, 1985, following an incident during which Buie was riding in a police vehicle for the purpose of showing an officer where some stolen property was hidden. The testimony of several First District officers supports McMullen’s claim that he was not disobeying the Superintendent’s order on September 18 because, in fact, the order was not given until that day. The Commission accepted McMullen’s version of the incident. Considering the evidence as a whole, it appears possible that the Superintendent was mistaken in his recollection of the date. Hence, we can find no manifest error.
For the foregoing reasons, the decision of the Civil Service Commission is affirmed.
AFFIRMED.